2024 IL App (1st) 230105-U

SECOND DIVISION
December 17, 2024

No. 1-23-0105

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 21554 |
| | ) | |
| GREGORY SMITH, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Van Tine and Justice McBride concurred in the judgment.

ORDER

¶ 1    *Held*: We affirm the circuit court's order denying defendant's postconviction petition after a third-stage evidentiary hearing. The circuit court's factual findings were not against the manifest weight of the evidence. Defendant has not established that he was shackled during the postconviction hearing or that his due process rights were violated by such restraints.

¶ 2    Defendant appeals from the circuit court's order denying his postconviction petition following a third-stage evidentiary hearing. He argues that the circuit court committed manifest error when it found that the new evidence supporting his postconviction claim was not so conclusive that it would change the result on retrial. Defendant also argues that he was improperly shackled during the postconviction hearing and his due process rights were violated as a result. We conclude that the circuit court did not commit manifest error by finding that

defendant failed to meet his evidentiary burden, and we conclude that defendant failed to establish his claim of a due process violation. Accordingly, we affirm.

¶ 3                              BACKGROUND

¶ 4     On June 30, 2006, Cruse Caldwell and Maurice McDonald were walking south on South Ingleside Avenue from 52nd Street toward 53rd Street when a person approached them with a gun and began shooting. Both Caldwell and McDonald were shot. Defendant was arrested and charged for the shooting.

¶ 5     At trial, Cruse Caldwell testified that defendant was the person who shot him. Caldwell did not have the opportunity to identify defendant in a photo array or in a physical lineup during the investigation because he went into a coma after the shooting and did not come out of the coma for two months. When asked if he had been shown any photographs of defendant before trial, Caldwell stated that he had not, and that he did not need to be shown any photos of defendant to identify him because Caldwell saw defendant's face just before the shooting.

¶ 6     The other victim, Maurice McDonald, identified defendant as the shooter in a lineup during the investigation. McDonald gave a written statement to an Assistant State's Attorney in which he identified defendant as the shooter and provided other details about the shooting. McDonald could not be found before trial and did not testify.

¶ 7     Eddie Mastin, a retired Cook County Sheriff's officer, testified for the State. Mastin was sitting on a bench in the area of the shooting waiting to meet a friend. Mastin saw McDonald walk past him. When McDonald was halfway up the block, Mastin heard gunshots. Mastin saw a man on a bicycle and then saw another man jump on the back of the same bike. The person who jumped on the back of the bike had something in his hand that he put into his pocket. Mastin

identified defendant in a photo array as the person that jumped onto the back of the bike and who he believed to be the shooter. Mastin also identified defendant in a physical lineup.

¶ 8    A jury found defendant guilty of attempted first-degree murder and aggravated battery with a firearm. Defendant was sentenced to 21 years in prison.

¶ 9    Defendant filed a direct appeal of his conviction. We rejected his claims on appeal and affirmed. *People v. Smith*, No. 1-09-2256, 2011 WL 9717461 (2011) (unpublished order under Illinois Supreme Court Rule 23). Defendant filed a petition for leave to appeal to the Illinois Supreme Court which was denied. *People v. Smith*, 955 N.E.2d 478 (Table) (September 28, 2011). The federal district court denied defendant's petition for a writ of *habeas corpus*. *Smith v. Duncan*, No. 14 C 4071, 2014 WL 5543958, at *1 (N.D. Ill. Nov. 3, 2014).

¶ 10    Defendant filed a postconviction petition in June 2012. After counsel was appointed to represent him, defendant filed a supplemental postconviction petition claiming actual innocence. Defendant attached an affidavit to his supplemental postconviction petition from Maurice McDonald, one of the shooting victims. McDonald averred in his affidavit that defendant was not the person who shot him. McDonald averred that he "made it clear to the detectives, Gregory Smith was not the shooter" and that, instead, he identified defendant to the detectives as "the last person I spoke to before the shooting."

¶ 11    The circuit court granted the State's motion to dismiss defendant's supplemental postconviction petition. Defendant appealed, and we reversed. *People v. Smith*, 2021 IL App (1st) 181728, ¶ 33. We explained that "[w]hen the allegations defendant makes in his postconviction petition are taken as true and the statements in McDonald's affidavit are viewed in a light most favorable to defendant, it is apparent that defendant has made a substantial

showing of actual innocence such that an evidentiary hearing is warranted." *Id*. at ¶ 30. We remanded the case to the circuit court for a third-stage evidentiary hearing.

¶ 12    On remand, defendant chose to represent himself at the evidentiary hearing. The first witness defendant called to the stand was his mother, Kim Brownlee. Brownlee testified about an incident during the trial. Brownlee recounted that, after testifying, Cruse Caldwell was on the same elevator with Brownlee and her daughter. Brownlee recalled Caldwell told her in the elevator that he was shown pictures of defendant by the State's Attorney's Office so that he could identify defendant at trial. The alleged incident was brought to the trial judge's attention at the time it happened during the trial. The trial judge told defense counsel at the time that the defense could recall Caldwell if desired, but Caldwell was not recalled during trial.

¶ 13    Brownlee further testified that McDonald contacted her through Facebook in January 2015. McDonald informed Brownlee that he wanted to help defendant and provide an affidavit. McDonald told Brownlee that he was out of town and did not know that defendant was charged with the shooting. Brownlee drove to meet McDonald and picked up an affidavit from him. Brownlee testified that Caldwell also contacted her, and she was able to obtain an affidavit from him as well.

¶ 14    McDonald was the second witness defendant called at the evidentiary hearing. McDonald testified that, on June 30, 2006, he was walking with Caldwell when defendant came across the street to talk with him. Caldwell walked ahead. McDonald and defendant had a casual conversation as they knew each other from the neighborhood basketball courts. As they were talking, some other guys came from across the street and gunshots rang out. McDonald testified that he was still talking to defendant when the shooting started. Defendant did not have a gun in

his hands. McDonald and defendant ran in opposite directions and McDonald got shot. McDonald testified that he did not believe defendant had anything to do with the shooting.

¶ 15    McDonald testified that he spoke to detectives after the shooting. McDonald stated that he viewed a lineup and pointed out defendant to the detectives, stating that defendant was the last person he spoke to, not that defendant was the shooter. McDonald stated that detectives asked him to identify the last person he saw before the shooting not the shooter, so he identified defendant. McDonald testified he told detectives that he did not see the shooter, which was his way of saying defendant was not the shooter.

¶ 16    McDonald testified that he did not remember giving a written statement to the Assistant State's Attorney. He stated he did not tell investigators the details in the statement about himself but instead that it was all information the State could have found on its own. He admitted his signature appeared on the bottom of each page and on a photograph of himself attached to the statement. McDonald, however, denied the content of his statement and later stated that he did not read the statement or even remember it.

¶ 17    In the written statement, which was admitted into evidence, McDonald implicated defendant in some detail. The written statement contains significant biographical and occurrence information that lends to its credibility. McDonald stated in his written statement that he saw defendant Gregory Smith pointing the gun at him from approximately 5 feet away. He then turned around and attempted to run away, but Gregory Smith shot him in the right leg and he fell to the ground. McDonald stated that, while he was on the ground, Gregory Smith fired his gun approximately four more times at him and that nobody else on the street that day had a gun except for Gregory Smith.

¶ 18    In an affidavit supplied by Caldwell, Caldwell claimed that the detectives coerced him into implicating defendant. Caldwell averred that the detectives visited him at his home two years after the shooting, showed him a picture of defendant, and told him defendant was the person who shot him. Caldwell attempted to push back against the detectives' claims, but the detectives were persistent and told him they were 100% sure defendant was the person who shot him. Caldwell averred that as he was giving his testimony at trial that defendant was the one who shot him, he became certain defendant was not, in fact, the person who shot him. He tried to tell the trial judge defendant was not the shooter, but he was unable to do so because defense counsel had not posed a question to him and the trial judge did not permit him to make the statement. Caldwell averred in his affidavit that he spoke to defendant's mother in the elevator and told her the detectives had informed him defendant was the shooter and then forced him to testify. Caldwell averred that defendant was the person talking to McDonald and was not the shooter.

¶ 19    Detective Scott Reiff testified for the State at the evidentiary hearing. Detective Reiff was one of the detectives assigned to investigate the shooting of Caldwell and McDonald. Detective Reiff was with McDonald when he viewed the lineup. McDonald identified defendant as the shooter. Detective Reiff testified that at no point did McDonald identify defendant as the last person he spoke to before the shooting, he identified defendant as the shooter. Detective Reiff was also present when McDonald gave a written statement to the Assistant State's Attorney. McDonald gave the statement, was given the opportunity to make changes to the statement, and then signed it. Detective Reiff also signed the statement. Detective Reiff also signed the photograph of McDonald that was attached to the written statement McDonald had just given.

¶ 20    The circuit court issued a 9-page written order denying defendant's postconviction petition. The circuit court explained in its order that "[a]fter listening to his testimony and

gauging his demeanor, this court does not find McDonald to be credible." The circuit court recounted that McDonald waited eight and a half years to come forward, offering no explanation for such delay. The circuit court explained that McDonald's demeanor during the evidentiary hearing was "somewhat belligerent and indignant." After assessing McDonald's credibility and hearing the testimony of Brownlee and Detective Reiff, the circuit court found that defendant had not met his burden of demonstrating by a preponderance of the evidence that he was entitled to relief under the Post-Conviction Hearing Act.

¶ 21    The circuit court also made remarks in open court indicating that it did not find McDonald's testimony to be credible. The circuit court stated that it did not find McDonald's testimony, in light of its view of the witness's demeanor, to be of such a nature that it would lead to the possibility or the probability that the outcome would change at retrial. The circuit court informed defendant that, based on its credibility assessments and findings of fact, defendant had failed to establish by a preponderance of the evidence that he is entitled to relief. Defendant asked the court about the effect of Caldwell's affidavit, and the court responded that, under the applicable standard, it did not think the outcome would change based on the evidence. Defendant now appeals the circuit court's decision to deny him relief following the third-stage evidentiary hearing.

¶ 22                                ANALYSIS

¶ 23    I. Standard of Review

¶ 24    The Post-Conviction Hearing Act provides criminal defendants with the means by which to redress substantial violations of their constitutional rights that occurred during the original trial or sentencing. *People v. Robinson*, 2020 IL 123849, ¶ 42. A postconviction proceeding operates in three stages. During the first stage, the court must determine whether the

postconviction petitioner has made sufficient allegations, when taken as true, to present the gist of a constitutional claim. *People v. Hanks*, 335 Ill. App. 3d 894, 897 (2002). If a defendant's petition survives the first stage, the proceedings advance to the second stage. At the second stage, the defendant must show that the allegations in the petition, when taken as true, are sufficient to invoke relief under the Act. *People v. House*, 2020 IL App (3d) 170655, ¶ 28. If so, the petition advances to the third stage. At the third stage of proceedings, the allegations in the petition are no longer taken as true. *People v. Moore*, 2023 IL App (1st) 220919, ¶ 30. At a third-stage evidentiary hearing, the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92.

¶ 25    At the third stage of postconviction proceedings, the circuit court acts as the finder of fact at the evidentiary hearing, resolving any conflicts in the evidence and determining the credibility of witnesses and the weight to be given particular testimony. *People v. Domagala*, 2013 IL 113688, ¶ 34. The circuit court's decision following an evidentiary hearing, where fact-finding and credibility determinations are involved, will not be reversed unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. A ruling is manifestly erroneous only if it contains error that is clearly evident, plain, and indisputable. *People v. Williams*, 2017 IL App (1st) 152021, ¶ 22 (citing *People v. Hughes*, 329 Ill. App. 3d 322, 325 (2002)). This deferential standard of review reflects the understanding that the trial court is in the best position to observe and weigh the credibility of the witnesses. *People v. Coleman*, 183 Ill. 2d 366, 384-85 (1998).

¶ 26    II. Conclusiveness of the Evidence

¶ 27    Defendant argues that the circuit court erred when it denied him relief following a third-stage evidentiary hearing. He contends that, where both shooting victims exonerated him, he proved by a preponderance of the evidence that he is actually innocent. He asks us to reverse the

denial of his postconviction petition and vacate his convictions and sentence.

¶ 28    In order to prevail at the third stage of his proceedings, defendant was required to show that the new evidence is of such a conclusive character that it would probably change the result of the case if retried. *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). Defendant argues that the evidence he provided, in which both shooting victims now agree defendant was not the shooter, "[i]f heard at a new trial, [ ] would probably result in acquittal." Defendant highlights that both victims were injured in the shooting and he argues that they have no incentive to exonerate the person convicted as their shooter. Defendant contends that the witnesses' prior inconsistent statements can be explained by police misconduct. He suggests that the trial testimony implicating him was not strong. Defendant argues that Caldwell's inculpatory testimony was "not very convincing," and he argues that Eddie Mastin's testimony was "minimally inculpatory."

¶ 29    Defendant argues that the police picked their culprit in this case and then manufactured the evidence. He contends that the police told Caldwell who to identify and then falsely claimed that Mastin and McDonald identified defendant as the shooter. Defendant then highlights that Detective John Foster was involved in the investigation of this case and was present when the witnesses made their identifications of defendant. According to defendant, Detective Foster has cost the City of Chicago millions of dollars by coercing witnesses in other cases. Defendant claims that two of the other detectives involved in this case have been alleged to have coerced identifications and filed false reports.

¶ 30    Following the evidentiary hearing, the circuit court rejected McDonald's postconviction testimony in its totality as not credible. Defendant now asks us to revisit those findings and give weight to McDonald's testimony. On review from a third-stage evidentiary hearing, however, we

are not to second guess the circuit court's credibility findings. See *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1036 (2011) ("Credibility determinations such as this are properly made by the trier of fact, and we have no basis in the record for second-guessing the trial court's judgment.")

¶ 31    When McDonald testified at the evidentiary hearing, the State brought out inconsistencies in his version of events. For example, McDonald testified at the evidentiary hearing that he did not see the person with the gun, but then he testified that defendant and the shooter ran away from the shooting in the same direction. McDonald subsequently testified that there were people running after the shooting but that he could not necessarily say it was the shooter running away.

¶ 32    McDonald's testimony was significantly undermined by the written statement he gave to an Assistant State's Attorney. At the evidentiary hearing, McDonald could only explain away the statement by saying he did not remember it. He admitted his signature was on each page of the statement and on the photograph attached to the statement. He never testified that he did not, in fact, give the statement. At the evidentiary hearing, McDonald testified that he tried to tell detectives that defendant was not the shooter by telling them he did not know who the shooter was, but in his statement he clearly, and in detail, identified defendant as the person who shot him.

¶ 33    Detective Reiff testified that he was present for McDonald's identification of defendant and for his written statement. Detective Reiff testified that McDonald was not coerced to make his statement nor was he told who to identify in the lineup. Detective Reiff further testified that no one ever asked McDonald to identify the last person he spoke to before the shooting, they asked him to identify the shooter. Defendant did not impeach Detective Reiff at the evidentiary hearing or provide any other reason for the circuit court to doubt his testimony.

¶ 34    McDonald did not come forward until eight and a half years after the shooting. The

circuit court noted this issue in its written order by explaining that McDonald "offer[ed] no explanation as to why, after being gone for only six to seven months in 2006, he waited until 2015 to reach out to Smith's mother." McDonald identified defendant as the shooter in a lineup and in a written statement shortly after the shooting. He could not offer any explanation for his previous statement and identification other than to say he did not remember making the statement and he did not identify defendant as the shooter but only as the person he spoke with. The circuit court did not find McDonald's explanations to be credible.

¶ 35    Although McDonald did not testify at the original trial, his testimony at the evidentiary hearing was similar to a recantation. See *People v. Carter*, 2013 IL App (2d) 110703, ¶ 87. The recantation of testimony is regarded as inherently unreliable and, as a result, courts will not grant a new trial on the basis of a recantation except in extraordinary circumstances. *Morgan*, 212 Ill. 2d at 155. More important than its inherent unreliability, the circuit court did not believe McDonald's testimony at the evidentiary hearing. The viability of defendant's postconviction claim required that a factfinder believe McDonald's testimony. The court's determination that McDonald's testimony at the hearing was not credible was not against the manifest weight of the evidence. Therefore, the evidence presented by defendant at the evidentiary hearing was insufficient to establish a claim of actual innocence by a preponderance of the evidence, and the trial court's decision to deny relief was not manifestly erroneous. See *Carter*, 2013 IL App (2d) 110703, ¶¶ 85, 87-88.

¶ 36    Defendant relies on *People v. Ortiz*, 235 Ill. 2d 319 (2009) and *People v. Coleman*, 2013 IL 11307 to argue that he was entitled to postconviction relief following the third-stage evidentiary hearing. In *Ortiz*, the supreme court explained that, "[s]ignificantly, the [trial] court made no findings on [the new witness's] credibility." *Ortiz*, 235 Ill. 2d at 334. Instead, the trial

court in *Ortiz* had found that the new witness's testimony was cumulative of other evidence that was admitted at trial and did not reach its credibility. *Id*. at 335. The supreme court concluded that the trial court's decision that the testimony *was cumulative* was manifestly erroneous. *Id*. at 336.

¶ 37    In this case, the circuit court did not reject McDonald's testimony because it was cumulative. Indeed, we already decided that question when we reviewed the second-stage dismissal of defendant's postconviction petition. Here, the circuit court rejected McDonald's testimony because it was not credible and did not support the proposition that the result on retrial would be any different with the newly discovered testimony. That decision was not manifestly erroneous.

¶ 38    In *Coleman*, the defendant supplied testimony from his five co-defendants who all averred that the defendant was not present at and was not involved in the crime. *Coleman*, 2013 IL 11307, ¶ 103. The co-defendants could not or would not have come forward at the time of trial because they would have had to incriminate themselves. *Id*. at ¶ 102. The supreme court recounted the strength of the testimony provided by the co-defendants, explaining that their statements exonerating defendant were "remarkably consistent" on the key details. *Id*. at ¶ 106. The co-defendants' testimony was also consistent with a witness who testified at trial about defendant not being present at the scene of the crime. *Id*. The supreme court also discussed the conflicts and other issues with the trial evidence before explaining that the trial court's decision not to grant a new trial was manifestly erroneous. *Id*. at ¶¶ 108-14.

¶ 39    The new evidence in this case is not of the character of the new evidence in *Coleman*. Here, McDonald previously implicated defendant in a physical lineup and in a detailed written statement before changing his story eight and a half years later. McDonald's testimony was not

backed by "remarkably consistent" accounts from other witnesses. In fact, McDonald's testimony had internal inconsistencies and contradicted the prior version he gave of the shooting years earlier when he identified defendant as the shooter. Here, defendant has not shown the existence of the same kind of issues in the trial testimony that were present in *Coleman* to lead the Court to determine that "another trier of fact would probably reach a different result."

¶ 40 Defendant attempts to bolster his postconviction claims by interposing claims of police misconduct against the detectives involved in this case by invoking claims of police misconduct in other cases. However, defendant did not present any evidence to the circuit court of the detectives' alleged misconduct in other cases. When defendant indicated before the evidentiary hearing that he would argue that the detectives involved in the investigation were corrupt and that he wanted to bring a *Brady* claim, the circuit court informed defendant that he was making a new claim that was subject to the cause and prejudice test. Defendant then decided to go forward with his claim of actual innocence without developing any claim relating to the detectives' conduct in other cases. Defendant brought up the allegations of misconduct against the detectives in other cases during his closing argument at the evidentiary hearing, but the circuit court reminded him that he did not enter into evidence any allegations of misconduct against the detectives during the evidentiary hearing.

¶ 41 Defendant also relies on the affidavit from Cruse Caldwell. Caldwell supplied defendant with an affidavit in which he recants his trial testimony. Caldwell explains in his affidavit, consistent with the testimony from defendant's mother, that he tried to change his story at the end of his trial testimony but was unable to do so because of the rules of procedure. At the closing argument and when delivering its ruling following the evidentiary hearing, in response to queries from defendant, the circuit court acknowledged it was aware of Caldwell's affidavit. The

circuit court explained that Caldwell's affidavit did not change the fact that there was not a probability that the outcome of the case would be different on retrial.

¶ 42     As defendant acknowledges, Caldwell and his testimony are not new to the case. He testified at trial and provided a statement during sentencing. Caldwell provided a victim impact statement to be read at defendant's sentencing that contradicted the statements made by Brownlee, defendant's mother, that they had a conversation in the elevator. Caldwell affirmed in his impact statement that, while he was at the courthouse for trial, he "absolutely did not speak to or look at the defendant's mother on the elevator or at any other time."

¶ 43     Defendant claims that Caldwell realized at the end of his trial testimony that defendant was not the shooter. Defendant claims that Caldwell wanted to correct the record at that point but was unable to do so because a question had not been posed to him by defense counsel. However, the trial court gave the defense permission to recall Caldwell to testify about his alleged statement to defendant's mother in an elevator, but Caldwell was never recalled as a witness. Defendant does not explain why Caldwell was not recalled. Like McDonald, Caldwell did not supply an affidavit with this new version of events for eight and a half years after the shooting even though he purportedly had a change of heart during his trial testimony. Caldwell did not appear at the evidentiary hearing to substantiate any of the claims made in the affidavit.

¶ 44     Defendant has failed to show that the circuit court's decision following the evidentiary hearing was manifestly erroneous. The circuit court determined that the new evidence was not of such a conclusive character that it would probably change the result on retrial. Credibility determinations, such as the ones made by the circuit court here, are properly made by the trier of fact, and we find no basis in the record for second-guessing the circuit court's judgment. See *Gonzalez*, 407 Ill. App. 3d at 1036. A ruling is manifestly erroneous only if it contains error that

- 14 -

is clearly evident, plain, and indisputable. *Williams*, 2017 IL App (1st) 152021, ¶ 22. Here, the opposite conclusion is not clearly evident, plain nor indisputable and, thus, we may not disturb the circuit court's decision to deny defendant's postconviction relief.

¶ 45    III. Due Process Claim

¶ 46    Defendant argues that he was deprived of due process when he was kept in shackles or restraints during the third-stage postconviction hearing. To substantiate his claim that he was improperly shackled or restrained during the postconviction evidentiary hearing, defendant quotes one exchange from the postconviction evidentiary hearing transcript.

> "THE DEFENDANT: All right. Your Honor, I have a request. If it's okay with the staff, could I remove my restraints on my waist? I'll keep shackles on, but can I get the restraints off my waist?
>
> THE COURT: Yeah. When you do the hearing, unless there's some manifest security issue, I'll -- it's fine to have those hand restraints so you'll be able to take care of paperwork and things like that.
>
> THE DEFENDANT: Okay. All right. I appreciate it, sir."

According to defendant, "[t]he case was passed and recalled and the evidentiary hearing began. Restraints were never mentioned again."

¶ 47    Defendant now suggests for the first time on appeal that he was improperly shackled during the evidentiary hearing. Defendant argues that two things are clear: at least some restraints were kept on him during the evidentiary hearing and the court made no finding of a manifest need for the restraints. Defendant argues that the circuit court deprived him of due process by keeping him in restraints during the hearing and asks us to remand for a new evidentiary hearing.

¶ 48    Defendant asks us to conclude, from this one exchange before the hearing began, that he was impermissibly shackled during his evidentiary hearing. We have before us only the cold record with no indication that defendant was actually shackled or restrained in any way during the proceedings. In making his arguments to advance his claim of a due process violation, defendant's brief lacks record citations. He relies completely on the single exchange from the transcript noted above. Indeed, defendant concedes that restraints were not mentioned again at any point during the multi-day hearing aside from the brief request he made about them before the hearing that the circuit court granted.

¶ 49    However, even if we assume defendant's legs were shackled, there is no indication that defendant was hampered in his representation of himself or that the appearance of him in restraints prejudiced him in the eyes of the court. Defendant capably advanced his postconviction claims at the evidentiary hearing. Both the circuit court and the State complimented defendant in his representation of himself in a way that is extremely uncommon for *pro se* litigants. The circuit court stated to defendant, "first off, I do have to commend you because of the way you conducted the hearing. I thought you did a great job." The circuit court continued "I know you're representing yourself but the way you conducted yourself and the arguments you made were very well thought out. Better than some lawyers I've seen. So for that I do commend you." The attorney representing the State agreed and expressed that he wished to "adopt those compliments myself, Judge." The circuit court also praised defendant for the way he conducted himself during the hearing, stating "I also commend you for the professional demeanor throughout the entire time you've been before me."

¶ 50    Defendant relies on several cases to advance his argument that his due process rights were violated by being kept in restraints during the proceedings. Defendant begins by citing to

cases where defendants were shackled or restrained during trial. Those cases are not applicable here because those cases involved jury trials of defendants who had not been found guilty. In contrast, this case concerns postconviction proceedings at which there is no jury and the defendant has already been found guilty and no longer retains the presumption of innocence. See *People v. Greer*, 212 Ill. 2d 192, 204 (2004). Defendant does, however, rely on *People v. Rippatoe*, 408 Ill. App. 3d 1061 (2011) and *People v. Hawkins*, 2020 IL App (3d) 160682 to argue that, even in the postconviction context, it is impermissible to keep a defendant restrained during a hearing unless necessary, particularly where the defendant is representing himself.

¶ 51    In *Hawkins*, the court noted that another district of the court had rejected a claim that refusing to remove a defendant's shackles during a postconviction hearing required reversal (see *People v. Kelley*, 2013 IL App (4th) 110874, ¶¶ 25-26). In *Hawkins*, the State conceded that the shackling of the defendant was improper. *Id*. The defendant in *Hawkins* asked the court to be unshackled so he could handle his notes and other paperwork, but the trial court refused. *Id*. at ¶ 8. The defendant in *Hawkins* also made additional requests on the record to have his restraints removed, but his requests did not draw any response from the State or the court. *Id*. However, in *Hawkins*, the court distinguished the case from *Kelley* by noting that the shackles on the defendant in *Kelley* "had not impeded the defendant's ability to assist defense counsel in the presentation of the postconviction issues." *Hawkins*, 2020 IL App (3d) 160682, ¶ 12.

¶ 52    Similarly, in *Rippatoe*, the court observed that the defendant was hampered in his participation in the posttrial proceedings and could not even properly raise his hand to take the oath. *Rippatoe*, 408 Ill. App. 3d at 1067. The *Rippatoe* court found that a shackled defendant is diminished in his ability to represent himself and the integrity of the judicial process is demeaned when a defendant is required to participate in proceedings while shackled. *Id*. at 1068.

¶ 53    The record reflects that, unlike in *Hawkins* or *Rippatoe*, defendant was not impeded in his ability to represent himself. Defendant never asked to have his shackles removed other than the initial request he made which the circuit court granted. At another point in the proceedings, defendant asked the circuit court if he could remove the mask he was wearing pursuant to Covid-19 protocols and the circuit court granted defendant's request without any hesitation. There is no reason to believe the circuit court would have refused any requests from defendant to remove the restraints, if they were imposed, especially when the circuit court was so impressed with defendant's professional demeanor during the hearing.

¶ 54    The court in *Kelley* concluded that the presumption against shackling did not apply to postconviction proceedings. *Kelley*, 2013 IL App (4th) 110874, ¶ 25. The court rejected the premise in both of the third district decisions *Hawkins* and *Rippatoe*. Instead, the *Kelley* court found that the constitutional concerns with shackling a defendant that are present in the trial and sentencing phases of criminal proceedings are not present in postconviction proceedings. *Id*. The *Kelley* court further found that the dignity of the courtroom is not demeaned by having a convicted criminal appear in shackles when the defendant seeks review of his conviction or sentence because the defendant's guilt and sentence have already been determined. *Id*.

¶ 55    We acknowledge the differences between the fourth district's decision in *Kelley* and the third district's decisions in *Hawkins* and *Rippatoe*. However, we have no need to resolve the differences because defendant has not shown he was deprived of due process. The record shows that the court did not deny any requests for defendant to be unshackled, that the court did not form a negative opinion of defendant, and that defendant was able to more than capably represent himself without any limitations. Defendant has not shown he is entitled to a new evidentiary hearing.

¶ 56                                              CONCLUSION

¶ 57     Accordingly, we affirm.

¶ 58     Affirmed.